## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICIA A. SPIETH, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 08-504 |
| | : | |
| BUCKS COUNTY HOUSING | : | |
| AUTHORITY, et al., | : | |
| Defendants. | : | |

### MEMORANDUM AND ORDER

January 28 , 2009_____Anita B. Brody, J.

## I.  Introduction

On August 19, 2008, Patricia Spieth ("Spieth") filed a second amended pro se complaint against the Bucks County Housing Authority ("BCHA") and four BCHA employees, Mr. Donald E. Grondahl ("Grondahl"), Ms. Bonnie Bascio ("Bascio"), Ms. Christina Stuart ("Stuart"), and Ms. Patricia Bonatsos ("Bonatsos").  Spieth alleges violations of (1) "Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f)," (2) "Regulations 24 Code of Federal Regulations part 5; 24 CFR part 982," (3) "Title II of the Americans with Disabilities Act, 42 U.S.C. 12101 et seq.," (4) "section 504 of the Rehabilitation Act of 1973," and (5) "Section 804f3B of Title VIII of the Civil Rights Act of 1968 as amended by the Fair Housing Act of 1988."  On September 5, 2008, the Defendants filed a Motion to Dismiss Spieth's Complaint for Failure to State a Claim and/or Failure to Exhaust Administrative Remedies[1] under Federal Rule of Civil Procedure

---

[1] Defendants ask the court to dismiss this case because "Spieth failed to exhaust the tenant grievance procedure set forth at 24 C.F.R. §§ 966.50-966.57."  Defendants' Motion to Dismiss ¶ 10.  The Defendants cite the "exhaustion of remedies doctrine," but concede that this is a matter of judicial discretion, not a rule of law.  Defendants do not point to any law indicating that Spieth was required to exhaust her administrative remedies prior to seeking judicial review

12(b).

**II.  Background**

<u>A.  The BCHA</u>

The BCHA accepts Housing and Urban Development ("HUD") funds to provide low-rent housing for qualified applicants.  By accepting HUD funds, the BCHA agrees to comply with all HUD regulations and the United States Housing Act of 1937.  The BCHA provides housing vouchers for low-income applicants to lease privately owned residences.  Malinda Roberts, Director of Public Housing, Philadelphia Area Office. <u>Audit Report of The Bucks County Housing Authorities Tenant-Based Section 8 Program</u>, November 13, 2003 (available at http://nhl.gov/offices/oig/reports/files/ig431001.pdf).  Typically, under the Housing Act as amended by 42 U.S.C. § 1437 (the "Housing Act"), a qualified applicant will pay rent based on his or her income and then a public housing authority ("PHA") pays a private landlord the difference between the tenant's contribution and the rent agreed upon between the landlord and the PHA.

The Housing Act also establishes a rent ceiling:  a PHA generally may not require a tenant family to pay more than 30% of its monthly adjusted income as rent. 42 U.S.C. § 1437a(a)(1)(A); <u>McDowell v. Phila. Housing Auth.</u>, 423 F.3d 233, 236 (3d Cir. 2005).  HUD has interpreted rent to include the "reasonable cost of utilities," so PHAs must award monthly rebates (calculated based on the utility company's rates, climate, size of the unit, and other factors) to

---

under any of the laws cited by Spieth in her complaint.  Furthermore, defendants analyze Spieth's claims as being brought under Section 1983 and point to no exhaustion requirement in a Section 1983 claim brought under any of the laws cited by Spieth.

tenants who pay utility companies directly.  McDowell, 423 F.3d at 236.  If a tenant's utility bill exceeds the utility rebate, the tenant must make up the difference; if the rebate exceeds the bill, the tenant can keep the difference. Id. (internal citations omitted).

Under HUD regulation 24 CFR § 982.503, HUD has the discretion to approve higher than normal rental rates, referred to as exception rates, for certain units.  HUD may approve exception rent if HUD determines that a voucher holder cannot locate housing "bearing rents within the established Fair Market Rent (FMR) standards."  U.S. Department of Housing and Urban Development, Community Planning Website (available at http://www.hud.gov/offices/cpd/affordablehousing/library/homefires/volumes/vol3no3.cfm).  24 CFR §§ 982.503(c)(2)(ii) and (c)(4)(i) provide guidelines for when HUD may approve an exception rent:

> The HUD Field Office may approve an exception payment standard amount within the upper range if required as a reasonable accommodation for a family that includes a person with disabilities . . . . HUD will only approve an exception payment standard amount (pursuant to paragraph (c)(2) or paragraph (c)(3) of this section) if HUD determines that approval of such higher amount is needed either:  (A) To help families find housing outside areas of high poverty, or (B) Because voucher holders have trouble finding housing for lease under the program within the term of the voucher.

Standard payment amounts are based on unit size and range between 90% and 110% of "fair market rents" for the region (as determined by HUD). The upper range for exception rents is between 110% and 120% of fair market rent.  HUD's regulations indicate that the HUD Field Office has the "sole discretion" to approve exception payments.   24 CFR § 982.503 (c)(i).

B. Facts[2]

In July 2003, Spieth received a public housing voucher and list of available apartments from BCHA.  Spieth suffers from a medical condition that requires her to reside at a property that is equipped to handle installation of a medically prescribed sauna.   In August 2003, Spieth found a property equipped to handle a sauna in Perkasie, Pennsylvania, but when Spieth consulted with a staff member of the BCHA, she was informed that this particular property was not "rent reasonable."  In November 2003, Ms. Laura Palmer (BCHA Assistant Section 8 Coordinator) told Spieth that the Perkasie property was, in fact, rent reasonable.  The property, however, was no longer available and this delay cost Spieth "two months and two moves."  Additionally, when completing the voucher worksheet for the Perkasie property, Ms. Palmer "failed to allow Exception Utilities or request Exception Rent each of which were specifically requested by the Plaintiff, who at the time was an elderly, disabled medically documented individual."  Again in November 2003, Spieth requested exception rent and utilities in a letter addressed to defendant BCHA employee Bonnie Bascio and "Mrs. Lynn Pietrouchie."  Spieth also requested "another voucher extension as approved by Ms. Dorothy Brown HUD Headquarters."  It is unclear from the complaint what a "voucher extension" is, or if this request was granted or denied.  In late November 2003, Spieth asked that her son be permitted to participate in a conference call regarding "Request Tenancy Approval," but Ms. Palmer denied this request as well.

On December 10, 2003, Spieth again wrote to Ms. Palmer requesting exception rent

_____

[2] All facts and quotations in this section are taken from Spieth's 22 page pro se amended complaint and were considered in the light most favorable to Spieth.  While she makes only two "claims," (1) violations of Section 504 of the Rehabilitation Act and (2) violations of Title II of the Americans with Disabilities Act, I have attempted to analyze all potential causes of action in Spieth's complaint.

under 24 CFR § 982.503(c)(2)(ii) as a reasonable accommodation for a person with a disability. In this letter Spieth also informed Ms. Palmer of a property in Sellersville, Pennsylvania, whose owner ("Campbell") had approved Speith's housing voucher and the required wiring for the sauna.  On January 12, 2004, Ms. Palmer informed Spieth that the rent and utilities for the Sellersville property were "over by $7.00" and that Ms. Palmer was going to ask Campbell to reduce his rent by $7.00.  Campbell refused to do so.  Spieth and Campbell reviewed the paperwork and discovered an error that Ms. Palmer had made.   On January 13, 2004, Spieth again wrote to Ms. Palmer about the Sellersville property and about receiving exception rent and exception utilities.  On January 14, Campbell faxed "lease documents" regarding a Quakertown, Pennsylvania property, which he agreed to lease to Spieth based upon her housing voucher.  In February 2004, when Spieth received a notice from BCHA regarding the portion of rent she was required to pay, there was no allowance for exception rent or exception utilities.  Spieth currently resides in the Quakertown property.

Spieth claims that she first requested exception rent and exception utilities in November of 2003 and continued to periodically renew this request, but was ignored or "not acknowledged."  In October 2005, Spieth was re-certified for housing assistance.  At that time, she informed Ms. Christina Stuart of the additional expenses generated by the electricity needed for her medically required sauna and provided her with documentation.  Ms. Stuart allegedly did not use this documentation when calculating Spieth's rent.  During Spieth's November 2006 re-certification, her total paid medical expenses were again mis-calculated and no one acknowledged her exception rent and exception utility requests.  On numerous occasions in 2007, Spieth continued to request "corrections in utility calculations, correct rent adjustments,

corrections for excluded medical expenses, and additional consideration for Exception Rent and Exception Utilities."  In January 2008, Spieth received a fax from BCHA employee Bonnie Bascio stating that Spieth had received $4709 for medical expenses.  Spieth contends that this amount is incorrect and that she should have received more.  On January 25, 2008, Spieth requested an interim re-certification and reduction in rent because of new spine, ankle and leg injuries.  As of the filing of her complaint, Spieth had not received a response to this request.

Spieth alleges that "incorrect, incomplete and simply no answers have me [sic] an unstainable [sic] amont [sic] of money and time."   Spieth alleges that she requires exception rent and a "higher utility exception payment" in order to prevent financial hardship.  Spieth claims that not receiving these funds also "impacts her physical health as she is no longer able to purchase all prescribed vitamins, amino acids, minerals, etc. and [Spieth's] emotional health is at stake as well there isn't funding available for any type of entertainment or social activities due to the increase in food and gas and PP&L costs."  Spieth claims that BCHA's "lack of help" caused her stress, "wear and tear," two moves, numerous expenses, and considerable delay, particularly during the entire month of December 2003 when she was forced to make personal trips to the BCHA office because the fax machine was "chewing up Faxes."

### III.  Standard of Review

According to Fed. R. Civ. P. 12(b)(6), a court must grant a motion to dismiss if the plaintiff fails "to state a claim upon which relief can be granted."  In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true the well-pleaded allegations of the complaint and draw all reasonable inferences in the plaintiff's favor.  Brown v. Card Serv. Ctr., 464 F.3d 450, 452 (3d Cir. 2006).  "While a complaint attacked by a Rule 12(b)(6) motion to

dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds

of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation

of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 127 S.Ct.

1955, 1964-65 (2007) (internal quotations omitted).  A *pro se* complaint, "however inartfully

pleaded," is held "to less stringent standards than formal pleadings drafted by lawyers." Hughes

v. Rowe, 449 U.S. 5, 9 (1980).

This Court has jurisdiction under 28 U.S.C. § 1331 because Spieth's claims arise under

federal law.

## IV.  Discussion

### A.  The Housing Act of 1937 ("Housing Act"), as amended 42 U.S.C. § 1437

In the first sentence of her complaint, Spieth claims that the BCHA violated the Housing

Act, which they are required to comply with.  Specifically, Spieth cites 42 U.S.C. § 1437(f),

which is the section of the Housing Act entitled "Low-income Housing Assistance."  Subsection

"f" authorizes HUD to contract with local housing agencies, or with private owners of

residences, to rent units to tenants who are eligible for housing assistance.

Tenants eligible for housing assistance are entitled to bring claims under 42 U.S.C. §

1983 if they allege that a PHA over-billed them for utilities and/or charged them rent above the

statutory ceiling provided established in 42 U.S.C. § 1437.  See Wright v. City of Roanoke

Redevelopment and Housing Auth., 479 U.S. 418, 419-20 (1987) (holding that Petitioners had a

cause of action under § 1983 in a suit claiming that Respondent [a public housing authority]

violated the rent ceiling imposed by the Housing Act of 1937 as amended).  Spieth does not

claim that she was denied housing assistance, or that she was required to pay more than the rent

ceiling imposed by the Housing Act.  Spieth claims that she was denied rent and utility

"exceptions" as a disabled person, and that she was denied payment of other medical expenses

but Spieth does not allege that these denials violate any provisions of the Housing Act.   Spieth

has not stated a § 1983 claim alleging violations of the Housing Act and she does not contend

that her rental payments exceed the statutory ceiling imposed by the Housing Act.  Additionally,

Spieth does not contend that she was over-billed for her utilities, but that she was entitled to a

utility exception because of her disability.  Because Spieth is  proceeding *pro se*, however, I

dismiss this one claim under 14 U.S.C. § 1437 without prejudice to re-file if Spieth can allege

facts to support that BCHA  over-billed her for her utilities.

**B. Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794 and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132**

Spieth seems to state separate claims under Section 504 of the RA and Title II of the ADA.

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability in the

United States ... shall, solely by reason of her or his disability, be excluded from the participation

in, be denied the benefits of, or be subjected to discrimination under any program or activity

receiving Federal financial assistance." 29 U.S.C. § 794(a) (Section 504 of the RA). The RA was

"the first federal statute to provide broad prohibitions against discrimination on the basis of

disability." Yeskey v. Pa. Dep't of Corrections, 118 F.3d 168, 170 (3d Cir.1997).  Because the

RA applies only to federally funded programs and activities, Congress enacted Title II of the

ADA to extend these prohibitions to all state and local government programs and activities.  Id.

As a result, Title II of the ADA closely resembles the language of Section 504 of the RA and

states that "no qualified individual with a disability shall, by reason of such disability, be

8

excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (Section 202 of the ADA, Title II). Given their similar language and related purposes, Congress has directed that Title II of the ADA and Section 504 of the RA be construed and applied consistently. Yeskey, 118 F.3d at 170.

To state a claim of disability discrimination under Title II or Section 504, a plaintiff must make a prima facie showing of discrimination. In order to establish a prima facie showing of disability discrimination under the RA, the plaintiff bears the burden of proving that 1) he or she is a "handicapped individual," 2) he or she is "otherwise qualified" for participation in the program, 3) the program receives "federal financial assistance," and 4) he or she was "denied the benefits of" or "subject to discrimination" under the program. Nathanson v. Medical College of Pa., 926 F.2d 1368, 1380 (3d Cir.1991) (quoting Strathie v. Dep't. of Transp., 716 F.2d 227, 230 (3d Cir.1983)). Similarly, under Title II of the ADA a plaintiff must establish that 1) he or she has a disability; 2) he or she is otherwise qualified; and 3) he or she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because of her disability. Jones v. City of Monroe, 341 F.3d 474, 477 (6th Cir.2003); Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir.2003).

Once a plaintiff establishes a prima facie showing of discrimination, he or she has the burden of articulating reasonable accommodations that the defendant can make in order to comply with the ADA and the RA. Frederick L. v. Dep't. of Pub. Welfare of Com. of Pa., 364 F.3d 487, 492 n. 4 (3d Cir.2004) (construing Olmstead v. L.C., 527 U.S. 581, 587, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999)). The burden then shifts to the defendant to make any reasonable

9

accommodations, unless the defendant can prove that the accommodations would be unduly burdensome or fundamentally alter the program.  Frederick L., 364 F.3d at 487, 492 n. 4; Nathanson, 926 F.2d at 1384.  Thus, only after a plaintiff has established a prima facie case of disability discrimination must the court undertake a reasonable accommodation analysis.  If a plaintiff cannot establish a prima facie case of discrimination there is no violation of either the ADA or the RA and no accommodations are necessary.

Spieth has failed to state a claim under the ADA or the RA because she has not established a prima facie case of discrimination.  Spieth alleges that the BCHA and its employees did not follow certain HUD regulations and did not provide her with the appropriate exception rent, exception utilities, and medical expense reimbursements.  She does not contend, however, that she was denied these benefits or discriminated against *because of* her disability.  Spieth does not allege that she was precluded from participation in the housing assistance program or that she was denied benefits under the program because she was disabled;  therefore Spieth does not state a claim of disability discrimination under the RA or the ADA.

**C.  Housing and Urban Development ("HUD") Code of Federal Regulations, 24 CFR § 982**

Spieth further claims that she was denied exception rent in violation of the HUD Code of Federal Regulations.  The particular regulation Spieth refers to states that, "The HUD Field Office may approve an exception payment standard amount within the upper range if required as a reasonable accommodation for a family that includes a person with disabilities."  24 CFR § 982.503(c)(2(ii).  These exception payments are within HUD's discretion.  Id.  This federal regulation merely authorizes a HUD field office to approve an exception payment, it does not require such a payment.

10

HUD's federal regulations are legally unenforceable because they do not confer a private right of action.  Rather than fleshing out the personal rights created by statute, the regulations that HUD "seek[s] to enforce relate to 'institutional policy and practice, not individual instances of discrimination.' " Three Rivers Ctr. for Indep. Living v. Housing Auth. of City of Pittsburgh, 382 F.3d 412, 429 (3d Cir.2004) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 288 (2002)). "Thus the Housing Authority can fail to comply with the regulations and still not deny access to a disabled individual." Id. at 430.  In Three Rivers, the Third Circuit held that plaintiffs could bring suit to enforce their rights under the Rehabilitation Act, but that plaintiffs could not bring suit to enforce the HUD regulations developed pursuant to the Rehabilitation Act. Id. at 431.  "The reasons that compel us to conclude that plaintiffs cannot maintain their suit to enforce the HUD regulations as a private cause of action under Section 504 [of the Rehabilitation Act] also compel us to conclude that they cannot sue to enforce the regulations under Section 1983." Id.  A violation of HUD's regulations can, however, assist a court in determining whether another law was violated, such as the Rehabilitation Act.  Id.  Spieth cannot bring a claim in a District Court based on a violation of HUD's regulations because they do not create a private right of action.

**D.  The Fair Housing Amendments Act, 42 U.S.C.A. § 3601**

The Fair Housing Amendments Act ("FHAA") bars discrimination against disabled people in the sale or rental of housing and requires reasonable accommodations in "rules, policies, practices, or services" as necessary to allow a handicapped person to use and enjoy a dwelling. 42 U.S.C.A. § 3604(f).  There are three types of claims that a plaintiff with a disability may bring under the FHAA: 1) intentional discrimination, or disparate treatment, claims; 2) disparate impact claims; and 3) claims that a defendant refused to make "reasonable

11

accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." Cmty. Servs., Inc. v. Wind Gap Mun. Auth., 421 F.3d 170, 176 (3d Cir. 2005) (citing 42 U.S.C. § 3604(f)(3)(B)).

The text of the FHAA precludes discrimination in the sale or rental of a dwelling or in providing services or facilities in connection with that dwelling.  42 U.S.C.A. § 3604.  Typically, this act is used to bring suits against landlords, but courts have also held that this act applies to suits against municipalities and land use authorities.  Wind Gap, 421 F.3d at 176.  Third Circuit dicta suggests that the FHAA does not apply to suits against PHAs who provide disabled persons with vouchers for housing assistance.  The FHAA imposes liability on property owners, but was not "intended to impose liability on those who purchase or lease housing on behalf of handicapped persons."  Growth Horizons, Inc. v. Delaware County, Pa., 983 F.2d 1277, 1283 (3d Cir. 1993) ("[n]othing in the text or legislative history of § 3604(f)(1) suggests to us that Congress intended to regulate and thereby subject to judicial review the decision-making of public agencies which sponsor housing for the handicapped. This is not to say that the decision of such agencies cannot be tainted by bias against the handicapped. But that problem, if it exists, is far different from and presumably less serious than the problem of biased sellers and lessors Congress here addressed.").

Assuming arguendo that Spieth could have maintained a claim under the FHAA against the BCHA despite the fact that they have not sold nor rented her a dwelling, she has also failed to state such a discrimination claim in her complaint.  First, Spieth has not alleged discrimination sufficient to state a claim of disparate treatment.  In order to state a claim for disparate treatment

12

under the FHAA, a plaintiff must demonstrate that a "discriminatory purpose was a motivating factor behind the challenged action." Wind Gap, at 177 (internal quotations omitted). Here, Spieth brings claims under the FHAA against the BCHA and its employees simply for failure to grant her "exception rent and exception utilities" and "paid medical expenses" arising out of her medical disability. Speith also simply claims damages due to months of delay, inconvenience, and numerous moves caused by the BCHA's actions. Speith has failed to state a disparate treatment claim under the FHAA because she has not alleged any discrimination based on her handicap. Spieth does not allege that she was denied any housing or funds because of her disability, nor does she allege that BCHA had a discriminatory motive behind any denial of funds, nor does she allege that this denial had any discriminatory effect. Second, nothing in Spieth's complaint suggests that she is bringing a disparate impact claim because she alleges facts specific only to her situation.[3]

Third, Spieth has not stated a claim that the BCHA violated the FHAA by refusing to make a reasonable accommodation to allow her equal access to housing. In order to state a claim for failure to make a reasonable accommodation, a plaintiff must show that "the accommodations that it requested are necessary to afford handicapped persons an equal opportunity to use and enjoy a dwelling." Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Tp. of Scotch, 284 F.3d 442, 459 (3d Cir. 2002). Even if a discretionary extra housing subsidy for a disabled person is a

---

[3] Spieth does say at one instance in her complaint that she "bring[s] this action on her own behalf and on behalf of all other people who are similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2)." These rules, however, relate to class action suits and not to disparate impact claims.

"reasonable accommodation" under the FHAA,[4] Spieth has not claimed that this accommodation was necessary for her to use and enjoy her residence.  Spieth simply claims that she was denied additional funds necessary for her to "purchase all prescribed vitamins, amino acids, minerals, etc." and maintain her "emotional health . . . as . . . there isn't funding available for any type of entertainment or social activities due to the increase in food and gas and PP&L costs."

Spieth failed to show that there is a causal link between the denial of the extra funds and an inability to enjoy or use a dwelling.  "[T]he plaintiff in an FHAA reasonable accommodations case must establish a nexus between the accommodations that he or she is requesting, and their necessity for providing handicapped individuals an "equal opportunity" to use and enjoy housing."  Lapid-Laurel, 284 F.3d at 459; see also Smith & Lee Assoc., Inc. v. City of Taylor,

---

[4]Some courts have held that granting a financial subsidy to a handicapped group is not a "reasonable accommodation" under the FHAA. See Hemisphere Bldg. Co., Inc. v. Village of Richton Park, 171 F.3d 437 (7th Cir. 1999) (Posner, J.) (confining "the duty of reasonable accommodation in "rules, policies, practices, or services" to rules, policies, etc. that hurt handicapped people by reason of their handicap, rather than hurt them solely by virtue of what they have in common with other people, such as a limited amount of money to spend on housing . . . . It could be argued - it has been argued - that if handicaps cause poverty, financial concessions to the handicapped are accommodations.  But that would mean that handicapped people, in the name of reasonable accommodation, could claim a real estate tax rebate under the Fair Housing Amendments Act"); Salute v. Stratford Greens Garden Apartments, 136 F.3d 293, 301 (2d Cir. 1998) ("We think it is fundamental that the law addresses the accommodation of handicaps, not the alleviation of economic disadvantages that may be correlated with having handicaps . . . . Economic discrimination - such as the refusal to accept Section 8 tenants - is not cognizable as a failure to make reasonable accommodations, in violation of § 3604(f)(3)(B)."); but see Giebler v. M&B Assoc., 343 F.3d 1143, 1151 (9th Cir. 2003) ("reasonable accommodation can function to adjust for special needs that flow from the inability of disabled residents to meet otherwise applicable financial requirements).  The Giebler court discussed that Salute and Hemisphere cannot be reconciled with the Supreme Court's later decision in U.S. Airways, Inc. v.  Barnett, 535 U.S. 391 (2002), in which the Court held that accommodation requirements do sometimes require preferring disabled individuals over others similarly situated but not disabled and are not limited only to lowering barriers created by the disability. Giebler, 343 F.3d at 1154.

14

Mich., 102 F.3d 781, 795 (6th Cir. 1996) (holding that plaintiffs need to show that "but-for" the reasonable accommodation, they will likely be denied an equal opportunity to enjoy a particular dwelling); Bronk v. Ineichen, 54 F.3d 425, 429 (7th Cir.1995) ("[T]he concept of necessity requires at a minimum the showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability."); U.S. v. Cal. Mobile Home Park Mgmt. Co., 107 F.3d 1374, 1380 (9th Cir. 1997) ("[w]ithout a causal link between defendants' policy and the plaintiff's injury, there can be no obligation on the part of the defendants to make a reasonable accommodation.")

   Spieth claims that not receiving rent and utility exceptions has cost her time, energy, and numerous moves, but has not shown that she was denied an equal opportunity to use and enjoy housing.  Notably, Spieth has been living in the Quakertown residence for four years after searching for housing that could accommodate her housing voucher and her medical needs for approximately six months.  The Quakertown property was only the third property that Spieth attempted to rent using a BCHA voucher.  The complaint suggests that Spieth's current residence is equipped with a medically required sauna.  Spieth allegedly lost the opportunity to rent the Perkasie residence because of an error by a BCHA employee, not because of a denial of a reasonable accommodation, and does not state why she didn't rent the Sellersville property. Spieth has not shown that denial of exception rent or exception utilities prohibited her from finding appropriate housing.  It is insufficient for Spieth to claim that she suffers from general financial hardship as a result of not receiving extra funds - she must allege that she was denied an equal opportunity to obtain housing because a reasonable accommodation was not made.  Spieth has not claimed that she is unable to rent a suitable dwelling that accommodates her medical

15

needs, instead she claims general financial hardship as a result of her medical expenses.

**V.  Conclusion**

I find that Spieth has not stated a claim against the BCHA or its employees under the HA, the ADA, the RA, the FHAA, or HUD's federal regulations; therefore, Defendants' Motion to Dismiss is granted.

ORDER

**AND NOW**, this __28th___ day of January, 2009, it is **ORDERED** that Defendants'

Motion to Dismiss Under Rule 12(b) For Failure to State a Claim and/or, in the Alternative,

Motion to Dismiss for Failure to Exhaust Administrative Remedies (Doc. #18) is **GRANTED**.

Plaintiff's claim under the Housing Act of 1937, 42 U.S.C. § 1437, is dismissed without

prejudice to re-file if Plaintiff can allege that the BCHA over-billed her for her utilities as

prohibited by 42 U.S.C. § 1437.  All other claims are dismissed with prejudice.


s/Anita B. Brody
_____
ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:                Copies **MAILED** on _____ to:

17